1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34          **UNITED STATES DISTRICT COURT**
35          **WESTERN DISTRICT OF WASHINGTON**
36
37    ALAA ELKHARWILY, M.D.,

38                        Plaintiff,
39
40    vs.                                              **COMPLAINT**
41
42    FRANCISCAN HEALTH SYSTEM, a                      JURY TRIAL DEMANDED
43    Washington non-profit corporation,

44                        Defendant.
45
46          Plaintiff, for his complaint herein, states as follows:

**INTRODUCTION**

1.      Plaintiff brings this action seeking vacation of the judgment, including summary judgment, of this Court entered October 20, 2016, in Case No. 3:15-cv-05579-RJB (hereinafter "Elkharwily I"), because Defendant's counsel, as officers of this court, in said action committed fraud on the court as described herein and procured judgment through an unconscionable scheme to deceive the court and Plaintiff through the use of misleading, inaccurate, false and incomplete responses to discovery requests, failing to produce and concealing documents and information requested and Plaintiff was entitled to in discovery,  the presentation of fraudulent evidence, and the failure to correct the false impression created by said, misleading, inaccurate, and incomplete responses and false evidence.

2.      Plaintiff's independent action herein is permitted by Federal Rules of Civil Procedure, Rule 60(d) (3).

**JURISDICTION AND VENUE**

3.      This Court has jurisdiction of this action because it seeks relief from the judgment in Case No. 3:15-cv-05579-RJB in this Court because of fraud on the court and the acts complained of herein occurred in the Western District of Washington.

**DEFENDANT'S COUNSEL'S DUTIES RE: FRAUD ON THE COURT**

4.      "Where the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practiced on him by his opponent . . . these and similar cases which show that there has never been a real contest in the trial or hearing of the case are reasons . . . to set aside or annul the former judgment or decree, and open the case for a new and fair hearing." *U. S. v. Throckmorton*, 98 U.S. 61, 65, 25 L.Ed. 93 (1878).

5.     Perjury and nondisclosure that defiled a court amounts to a fraud on the court. *In re Levander*, 180 F.3d 1114 (9th Cir. 1999) (quoting 7 James Wm. Moore et al., Moore's Federal Practice ¶ 60.33, at 515 (2d ed. 1978).

6.     A party can be found to have engaged in a scheme to defraud the court and "improperly influence" its decisions through "the use of misleading, inaccurate, and incomplete responses to discovery requests, the presentation of fraudulent evidence, and the failure to correct the false impression created by" a witness' testimony.  *Pumphrey v. K. W. Thompson Tool Co.*, 62 F.3d 1128, 1132 (9th Cir. 1995).

7.     Counsel may not withhold information from his client's discovery responses.  *Id.*

8.     As an officer of the court, counsel has a duty to not mislead the court or fail to correct a misrepresentation or fail to retract false evidence submitted to the court.  *Id.*

9.     The courts have "historic power of equity to set aside [a] fraudulently begotten judgment" in order to uphold the "preservation of the integrity of the judicial process." *Hazel-Atlas Glass Co. v. Hartford-Empire Co*., 322 U.S. 238, 245 (1944).; see also *Chambers v. NASCO, Inc*., 501 U.S. 32, 44 (1991) ("[This] inherent power ... allows a federal court to vacate its own judgment upon proof that a fraud has been perpetrated upon the court. [...] Moreover, a court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud."). As the Supreme Court commanded in *Hazel-Atlas*, "the public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud."

10.     "[S]imple dishonesty of any attorney is so damaging on courts and litigants that it is considered fraud upon the court." *Estate of Adams v. Fallini*, No. CV 24539 (Nev. 5th Dist. Ct. Aug. 6, 2014), at 6-7.

11.     "Our adversary system for the resolution of disputes rests on the unshakable foundations that truth is the object of the system's process which is designed for the purpose of dispensing justice … Even the slightest accommodation of deceit or a lack of candor in any material respect quickly erodes the validity of the process." *United States v. Shaffer Equipment Co.*, 11 F3d. 450, 457 (4th Cir. 1993).

12.     Perjury or nondisclosure of evidence alone constitutes fraud on the court if it was so fundamental that it undermined the workings of the adversary process itself.  *United States v. Estate of Stonehill,* 660 F.3d 415, 445 (9th Cir. 2011).

13.     "Litigation is not a game. It is the time-honored method of seeking the truth, finding the truth, and doing justice. When a corporation and its counsel refuse to produce directly relevant information an opposing party is entitled to receive, they have abandoned these basic principles in favor of their own interests." *Haeger v. Goodyear Tire & Rubber Co.*, 793 F.3d 1122, 1125 n. 1 (9th Cir. 2015) (quoting with favor the trial court.)

14.     Counsel must "certify and sign" and make complete and correct discovery responses and disclosures.  FRCP Rule 26(g).

15.     The Washington Rules of Professional Conduct provide that a lawyer shall not knowingly "1)  make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer" or "(4)  offer evidence that the lawyer knows to be false."  RPC 3.3 (a).

16.     The Washington Rules of Professional Conduct Rule 8.4 (c) provides that a lawyer shall not "engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

17.     The Washington Rules of Professional Conduct Rule 8.4(d) provides that a lawyer shall not "engage in conduct that is prejudicial to the administration of justice."

1       18.     The Washington Rules of Professional Conduct Rule 4.1 provides that in the

2   course of representing client a lawyer shall not knowingly (a) make a false statement of material

3   fact or law to a third person; or (b) fail to disclose a material fact to a third person when

4   disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless

5   disclosure is prohibited by Rule 1.6.

6       19.     To become admitted to practice in this court, counsel swore and promised, *inter*

7   *alia,* "I will conduct myself in an honest and ethical manner at all times. . ."

8       20.     The Washington Rules of Professional Conduct Rules 5.7 and 5.10, provide that

9   all of Defendant's counsel are responsible for correcting the actions of their co-counsel.

10                          **FACTUAL BACKGROUND**

11      21.     *Elkharwily I* was an action in this Court by Plaintiff against Defendant alleging,

12  inter alia, that Defendant violated the Washington Law Against Discrimination by discriminating

13  against Plaintiff because of his disability when it denied Plaintiff's application for privileges to

14  practice medicine in one of Defendant's hospitals so that Plaintiff could work as a nighttime

15  hospitalist for Group Health System in that hospital.

16      22.     Defendant, a corporation, was represented in *Elkharwily I* by the firm of Brown,

17  Bennett & Bigelow and attorneys Bruce Megard and Erin Seeberger of said firm.

18      23.     Defendant and its administrators, and various committees including but not

19  limited to the Medical Executive Committee (MEC), the RCC, and the Credentialing and

20  privileges signing members, were all represented by said Counsel since the beginning of

21  Plaintiff's application for privileges through the internal appeal process before various tribunals,

22  bodies and committees.

23      24.     *Elkharwily I* was tried to a jury and on October 19, 2016, the jury returned a

24  verdict in favor of Defendant.

25.     In *Elkharwily I,* Group Health had offered Plaintiff a job as a nighttime hospitalist at its St. Joseph's Hospital in Tacoma, WA, contingent upon Defendant granting privileges to Plaintiff.

26.     A crucial issue in *Elkharwily I* was whether Defendant refused to give Plaintiff a chance to prove his competency through proctoring by Group Health System hospitalists at night at Defendant's hospital on and after September 13, 2012.

27.     Defendant claimed in *Elkharwily I* that the unavailability of Group Health hospitalists to proctor Plaintiff at night was the most important reason for Defendant denying privileges to Plaintiff, and Defendant's counsel so argued to the jury.

28.     Defendant's voluntary summary judgment motion in *Elkharwily I*, signed by Defendant's counsel, stated as true fact that Group Health could not provide proctoring for Plaintiff because Group Health <u>did not have available hospitalists(s) to proctor Plaintiff at night</u>. For example, in Defendant's summary judgment motion in *Elkharwily I*, at 23, Defendant stated, ". . . it would have been absolutely reasonable for FHS to determine that night shift proctoring was necessary, and to deny his application <u>where such proctoring was not available.</u>"

29.     In fact, Group Health had hospitalists available and qualified to proctor Plaintiff at relevant times, at its St. Joseph's Hospital in Tacoma, WA on and after September 13, 2012, to wit: Dr. Bob Thong, Dr. Saif Hasnain, and Dr. Lisa Pujol, who had previously been credentialed and privileged by Defendant and its credentialing committees to work in St. Joseph's Hospital.

30.     Dr. Thong had been licensed to practice medicine in Washington since 2009 and worked for Group Health from September 2012 to at least June, 2017, as a nocturnist, including at Defendant's St. Joseph's Hospital from 2012 - 2014.  Dr. Thong was an employee of Group Health at Defendant's hospitals throughout the pendency of *Elkharwily I* and was previously

1  credentialed and privileged by Defendant and its credentialing committees to work in St.

2  Joseph's Hospital.

3      31.     Dr. Thong possessed the experience and tenure to proctor Plaintiff as a nocturnist.

4  He had worked for Defendant for about 4 years prior to September 2012 as a nocturnist in

5  Defendant's St Joseph Hospital, where Plaintiff had been hired to work by Group Health.  Dr.

6  Thong had covered and managed Group Health patients at night for those four years before

7  joining Group Health's team. He had proctored medical personnel/before joining Group Health

8  in 2012.  Dr. Thong had experience proctoring doctors one-on-one, including four to five

9  residents per month including while he was working for Group Health.

10     32.     Dr. Thong, according to him, was available and would have been willing to

11  proctor Plaintiff as a nocturnist from September 13, 2012, onward.

12     33.     Dr. Hasnain passed his internal medicine boards in August 2012. He was

13  therefore qualified to proctor Plaintiff at relevant times. Dr. Hasnain remained an employee of

14  Group Health working at Defendant's hospitals throughout the pendency of *Elkharwily I*. Dr.

15  Hasnain has been advanced in leadership positions through his tenure.

16     34.     Dr. Hasnain was available to proctor Plaintiff from September 13, 2012, onward,

17  according to Dr. Thong.  Dr. Hasnain worked as a nocturnist in September 2012 for Group Health in

18  Defendant's St Joseph Hospital for two years before moving to and continuing working for Group

19  Health in another of Defendant's hospitals.

20     35.     Dr. Hasnain was granted credentials and privileges by Defendant and its credentialing

21  committees in August 2012, before he had any clinical experience following residency.

22     36.     By 2012, Dr. Pujol had several years' experience as a nocturnist and had passed

23  her internal medicine boards in 2005.   Dr. Pujol was therefore qualified to proctor Plaintiff at

1    relevant times.  She was previously credentialed and privileged by Defendant and its

2    credentialing committees to work in St. Joseph's Hospital.

3        37.    Dr. Pujol was available to proctor Plaintiff in and after September 2012,

4    according to Dr. Thong.

5        38.    It was undisputed in *Elkharwily I* that Defendant never told Plaintiff that night

6    time proctorship was required. Nor did Defendant tell Group Health that proctorship at night was

7    required for Plaintiff's privileges.  At relevant times, Plaintiff knew that Group Health intended

8    to hire noturnists in addition to himself, but Plaintiff did not know whether they were actually

9    hired or were granted privileges by Defendant, which process was distinct and independent from

10   Group Health's credentialing process.    This was confirmed by Defendant's Counsel, who stated

11   to the jury and to the court  in his opening statement at *Elkharwily I* Transcript., 10/11/2016, at

12   28, "..So even though Dr. Elkharwily had been hired by Group Health, FHS had this independent

13   responsibility to engage in this credentialing process in order to comply with its bylaws, in order

14   to properly vet Dr. Elkharwily, to carefully and critically examine his application, and to try and

15   ensure that only competent physicians could provide care to its patients in the hospital safely.

16   The credentialing process is required by the Joint Commission on accreditation of hospitals. It is

17   also required by Medicare, who requires that hospitals do that if they see patients who are

18   covered by Medicare." And counsel reconfirmed the same at closing at *Elkharwily I* Transcript,

19   10/182016, at 93,  " But you have heard that whatever happens at Group Health is independent

20   of Franciscan's obligations for credentialing, as required under the Joint Commission guidelines

21   and by Medicare"

22       39.    During Defendant's internal appeal of Defendant's denial of Plaintiff's

23   application for privileges to Defendant's Review Panel, Appellate Review Board and Board in

24   2013, counsel for Defendant, Mr. Megard, concealed from Plaintiff and from Defendant's

1   Review Panel and Appellate Review Board and Board, whose meetings he attended as attorney

2   for the MEC, the foregoing information about the availability and qualifications of the three

3   Group Health nocturnists to proctor Plaintiff, and failed to correct testimony to the contrary

4   provided to said bodies.

5          40.       The minutes of Defendant's Regional Credentialing Committee on August 6,

6   2012, and Medical Executive Committee on August 9, 2012, and September 13, 2012, provided

7   to the Hearing Panel which met in January 2013, were incomplete and were altered by

8   Defendant's counsel so as to exclude one or more sections of information showing the

9   availability of the three Group Health Nocturnists to proctor Plaintiff.

10         41.        In connection with the hearing panel in January 2013, Defendant's counsel

11  represented to Plaintiff, to the chairperson and to the panel that he had produced all documents.

12  As this court noted "Mr. Bruce Megard, Defendant's lawyer, states in a signed

13  declaration............that if Mr. Megard had been asked, he "would have informed [Plaintiff] that

14  <u>all discovery documents under FHS's Medical Staff Bylaws had already been produced during</u>

15  <u>the course of the appeal process</u> and that additional disclosures were not permitted under those

16  same Bylaws. Dkt. 66 at ¶¶2, 3." Counsel, however, produced altered and false minutes and

17  concealed the existence and qualifications of  Group Health proctors who had been previously

18  credentialed by Defendant and were available to proctor Plaintiff at night.

19         42.       Throughout the Panel Review hearing Defendant's counsel and Defendant's

20  administrators Drs. deLeon and Cammarano proceeded without correcting the record that was

21  used to support Defendant's position that Group Health proctors were not available for Plaintiff,

22  although Defendant's counsel, Cammarano and deLeon knew there were proctors available.

23         43.        In his opening letter to Defendant's Hearing Panel, and before hearing any

24  testimony from any one, including David Dempster M.D., a Group Health physician and also a

9

1   clinical section chief and administrator of Defendant FHS, Mr. Megard stated: "The MEC

2   recognized at the meeting that Dr. Elkharwily was hired as a nocturnist but the proctoring plan

3   did not cover monitoring or observation during what would be Dr. Elkharwily's normal shift. The

4   MEC did not believe that this proctoring plan was sufficient because it felt that the proctoring

5   should take place in the same environment in which the practitioner would practice. . . Here, the

6   concerns about Dr. Elkharwily's lack of board certification, his limited clinical activity during the

7   previous two years, his lack of experience in a hospital setting, and the unavailability of any

8   appropriate proctoring or supervision during the night shift in the hospital clearly establishes that

9   a reasonable mind could accept that the evidence supports the recommendation to deny his

10  appointment." Megard letter, 12/31/2012, at 5-8.

11          44.    Although Defendant's counsel Mr. Megard knew by the time of the Hearing Panel

12  hearing in January 2013 that there had been three Group Health nocturnists privileged by

13  Defendant available and qualified to proctor Plaintiff at night, whose existence counsel

14  concealed from the hearing panel and Plaintiff, he compounded the concealment of evidence and

15  the production of altered and falsified minutes to the Panel Hearing by stating to the panel that

16  Dr. Elkharwily was:

17          "responsible for supporting his ...challenge to the adverse recommendation or decision by
18          presenting relevant evidence as rebuttal."(Bylaws,ArticleVII.7.E.) Dr.Elkharwily
19          ultimately has the burden of proof at this Hearing to show that the decision was
20          unreasonable or not supported by the evidence. In other words, he must show the MEC's
21          decision was arbitrary and capricious.
22
23  Megard letter to Panel Hearing, 1/31/2013, at pages 3-4.
24
25
26          45.    During the panel hearing, Dr. Dempster, a Group Health physician and also

27  clinical section chief and administrator for Defendant, testified that Group Health had no

28  "redundant" staffing to proctor Plaintiff, which was contrary to the facts and records concealed

29  from Plaintiff

1          46.     Had the Hearing Panel known of the availability and qualifications of the three

2  Group Health nocturnists to proctor Plaintiff, it would have found that the MEC had acted in bad

3  faith.

4          47.     To Defendant's Appellate Review Board, Mr. Megard wrote on May 7, 2013,

5  page 5, "Therefore, additional discussions about the proctoring plan with Group Health would

6  not address the MEC's concerns, <u>as there was no proctoring available at night.</u> The MEC's

7  recommendation was reasonable and should be upheld."

8          48.     Had the Appellate Review Board known of the availability and qualifications of

9  the three Group Health nocturnists, it would have reversed Defendant's denial of privileges to

10  Plaintiff.

11         49.     In its report to the National Practitioners Data Bank, Defendant stated that

12  Plaintiff had failed to demonstrate the scope and adequacy of his experience or his current

13  clinical skill and competence for active medical staff membership and privileges.  This statement

14  was in furtherance of Defendant's and its counsel's course of fraudulently denying Plaintiff his

15  rights by not telling Plaintiff that he needed night proctoring to show his qualifications knowing

16  that Group Health had nocturnists available to proctor him.

17

18         50.     The  court in *Elkharwily I* granted summary judgment on Plaintiff's defamation

19  claim based on Defendant's aforesaid report to the National Practitioners Data Bank on the

grounds that the report was privileged.

1

2    51.    Had Defendant's counsel not concealed the identity and qualifications of the

3    available Group Health nocturnists to proctor Plaintiff, Plaintiff could have successfully shown

4    that Defendant acted in bad faith and knowingly prohibited Plaintiff from showing his

qualifications.

5    52.    At trial Defendant's counsel argued that Defendant's MEC had acted in good

6    faith, compounding the fraudulent concealment of the availability and qualifications of the three

7    available nocturnists to proctor Plaintiff.

8    53.    Plaintiff's Request for Production No. 6 demanded that Defendant "Produce all

9    agendas, minutes, recordings, transcripts, exhibits, evidence, notes, correspondence and other

10    documents related to each meeting, hearing, appeal and other proceeding related to Plaintiff's

11    application for privileges and Defendant's action thereon."

12    54.    In response to Plaintiff's Request for Production of Documents No. 6 in

13    *Elkharwily I,* Defendant through its counsel produced versions of minutes of Defendant's

14    Regional Credential Committee on August 6, 2012, and Defendant's Medical Executive

15    Committee on August 9 and September 13, 2012, which were altered by Defendant's counsel to

16    conceal portions of said minutes that reflected the availability of said Group Health nocturnists to

17    proctor Plaintiff. Additionally, Defendant's counsel produced, advanced and used, knowingly

1   and with reckless disregard of the truth, the altered and falsified minutes as evidence in court of

2   law to advance their scheme of defrauding Plaintiff, the jury, and the court.

3         55.    Defendant's counsel concealed evidence in response to then pro se Plaintiff's

4   Interrogatory No. 3 to Defendant in *Elkharwily I*, which asked Defendant to "Identify each

5   physician who performed hospitalist services in Defendant's hospital as an employee or contract

6   physician in 2011-2013." On March 7, 2016, in response to Interrogatory No. 3, signed by

7   Defendant's counsel, Defendant's counsel produced a list of hospitalists from Defendant's FIT

8   Inpatient Team.  Drs. Pujol and Hasnain were not on that list.  Dr. Thong was on the list as a FHS

9   employee.  However, that reference does not suggest that he was also a GHP hospitalist during that

10  time period.  If Defendant had included and identified him as "contract" physician, Plaintiff could

11  have determined Dr. Thong's relationship to GHP. And, if Defendant had included Dr. Pujol or Dr.

12  Hasnain on the contract physician list Plaintiff could have determined their availability as Group

13  Health nocturnists working in Defendant's hospital to proctor Defendant

14        56.    Defendant's counsel concealed evidence in response to then pro se Plaintiff's

15  Interrogatory 7 in *Elkharwily I,* which asked: "Identify by name, race and national origin of [sic]

16  each physician who applied for privileges to practice in Defendant's hospital in 2011-2013."  On

17  March 7, 2016, in response to Interrogatory No 7, Defendant's counsel produced a 47 page list

18  "reflecting all physicians who have been granted privileges by Defendant from 2009 to 2015…"

19  Said three physicians' names were not on that list.

20        57.    Defendant's counsel concealed evidence in response to Plaintiff's Third Set of

21  Interrogatories, No. 1, which asked for the identity of physicians who had applied for privileges

22  to Defendant from 2010-2015  who were granted privileges without any clinical experience

23  following residency.   On June 27, 2016, three days before the discovery deadline, Defendant's

24  counsel produced a 22-page list of "medical staff members who were granted privileges"

1   between 2010 and 2015, which was marked by Defendant's counsel as Bates Nos. FHS 001025-

2   001046. Physicians on this list were identified only by number.   Dr. Hasnain's name was not

3   disclosed on that list, although he was granted privileges without having any clinical experience

4   after residency.

5       58.     Defendant's counsel concealed evidence in response to Plaintiff's Third Set of

6   Interrogatories, No. 2, which asked for information about physicians granted privileges who

7   were not board certified when privileges were granted.  On June 27, 2016, three days before the

8   discovery deadline, Defendant's counsel produced a list of doctors, identified by number only,

9   who were not board certified when granted privileges by FHS and a list of those who became

10  board certified after privileging, which was marked by Defendant's counsel as Bates Nos. FHS

11  001047-FHS001050.  Physicians on this list were identified only by number and Dr. Thong's

12  name was not on that list.    Counsel argued in opposition to Plaintiff's motion to compel and

13  misrepresented to the court that the names of proctors are irrelevant. Counsel knew very well the

14  relevance of those names, identities and their qualification both in prosecuting Plaintiff's case

15  and in showing the fatality of Defendant's defense. The court was persuaded by counsel's deceit

16  and misrepresentation to deny Plaintiff's motion to compel.

17      59.     Defendant's counsel's concealment of the matter of Dr. Hasnain's lack of

18  experience and Dr. Thong's lack of board certification when they were granted privileges

19  deprived the court and jury of information important to considering whether Defendant's reasons

20  for denying privileges to Plaintiff were pretext.

21      60.     Defendant's counsel, Mr. Megard and Ms. Seeberger, hired an expert witness for

22  Defendant, Dr. Nancy Auer, and solicited and elicited her report and testimony before the court

23  and jury in *Elkharwily I.*

1    61.    Defendant's counsel identified Dr. Auer as an expert by disclosure, signed and

2    dated April 28, 2016, and reserved the right to amend or supplement its disclosure, which they

3    never did.

4    62.    Defendant's counsel's hiring an expert and supplying her with documents to

5    review on which to base her opinion was voluntary.  Defendant's counsel's choice of documents

6    to provide to Dr. Auer for review was voluntary and intentional.

7    63.    Defendant's counsel provided Dr. Auer with documents to review before

8    rendering her opinion in *Elkharwily I, including* the altered and falsified minutes of the MEC and

9    RCC to use as evidence to advance her testimony, under oath, in court to further their scheme to

10    defraud Plaintiff, the jury, and the court.

11    64.    On March 28, 2016, Dr. Auer issued her expert report. Her report stated that she

12    had reviewed and considered the following documents in reaching her opinions in *Elkharwily I*:

13    **a.**    "Plaintiff's Second Amended Complaint;

14    **b.**    Defendant Franciscan Health System's Initial Disclosures with exhibits and

15    attachments thereto;

16    **c.**    Defendant Franciscan Health System's Supplemental Initial Disclosures with

17    exhibits and attachments thereto;

18    **d.**    Defendant Franciscan Health System's Second Supplemental Initial Disclosures

19    with exhibits and attachments thereto;

20    **e.**    Plaintiff s Interrogatories and Requests for Production to Defendant with Answers

21    and Responses Thereto dated March 7, 2016, with exhibits and attachments

22    thereto."

1    In addition to the foregoing listed materials, Dr. Auer stated that she intended "to review any

2    depositions which may occur in (*Elkharwily I*), any supplemental documents produced by the

3    parties, and other expert reports produced by the parties in this matter."

4           65.    At trial, Dr. Auer testified that in developing her opinions she reviewed, "A whole

5    bunch of paper. . . Dr. Elkharwily's application, his due process committee meetings, all of the

6    paperwork he presented in this case, and the depositions taken in this case."  She also reviewed

7    'the Franciscan Health System Bylaws" and "all of the minutes from the various committee

8    meetings that discussed Dr. Elkharwily and all of the testimony and documents associated with

9    [Plaintiff's] process."

10          66.    Dr. Auer read all documents given to her by Defendant's counsel, including those

11   that concealed facts concerning the three nocturnists available to proctor Plaintiff and including

12   the committees' minutes that were altered and falsified.

13          67.    Defendant's counsel fraudulently, knowingly and willfully concealed from Dr.

14   Auer the evidence of the availability and qualifications of Group Health nocturnists, Drs. Thong,

15   Hasnain and Pujol, to proctor Plaintiff at night.  Thus, Dr. Auer was left with the understanding

16   that there were no Group Health nocturnists available to proctor Plaintiff at night at Defendant

17   hospital at the time Defendants claimed night proctorship was essential and fundamental issue to

18   grant Plaintiff privileges.

19          68.    Defendant's counsel also concealed from Dr. Auer facts, documents and

20   information about Drs. Hasnain and Thong regarding their board certification and experience

21   stated above. Counsel willfully and knowingly advanced her testimony, under oath, as an expert

22   to the court and jury and at no time did they attempt to correct, withdraw or supplement her

23   testimony.

69.    Because of Defendant's counsel's fraudulent concealment of the facts regarding

Drs. Thong, Hasnain and Pujol, and because of their presentation of fabricated or altered, and

falsified documents such as the minutes of MEC and RCC to her, Dr. Auer issued a misleading

and false expert report in *Elkharwily I*, which stated at page 4, "Because proctoring was not

available by Group Health in the clinical setting in which Dr. Elkharwily intended to practice, it

was reasonable for FHS to deny his application for medical staff membership." And at page 5 of

her report, Dr. Auer stated,, "Because nocturnal monitoring was not available by Group Health,

it was reasonable for FHS to deny Dr. Elkharwily's application for medical staff membership.

70.    At trial in *Elkharwily I,* Defendant's counsel willfully advanced false evidence,

under oath, to the jury and court and failed to correct same, by asking Dr. Auer, "If proctoring

was not available for Dr. Elkharwily in the night-shift, in your opinion, did denial of his

application meet credentialing standards?" to which the witness answered  "Yes."

71    Had Dr. Auer known of the availability and qualifications of the three Group

Health nocturnists to proctor Plaintiff, concealed by Defendant's counsel, she would have

testified that Defendant did not meet credentialing standards in denying privileges to Plaintiff,

when Defendant knew of the availability of the three Group Health nocturnists working in their

own very hospital.

72.    Defendant's counsel knew that Drs. Thong, Hasnain and Pujol were Group Health

hospitalists available to proctor Plaintiff on and after September 13, 2012, at Defendant's

hospital.

73.    Drs. Thong, Hasnain and Pujol were granted privileges by Defendant to work in

St. Joseph's Hospital, and Defendant's witnesses in *Elkharwily I*, Drs. Cammarano, deLeon and

Haftel, as members of Defendant's credentialing committees, knew of them, as did Dr. Dempster

as clinical section chief and administrator of Defendant.

1    74.    Because Drs.Thong, Hasnain and Pujol were granted privileges by Defendant,

2    they were referred to in Defendant's credentialing committees' minutes for relevant times as

3    Group Health hospitalists, but their names and affiliations with Group Health were concealed by

4    Defendant's counsel from Plaintiff, the  hearing panel, the Panel Review committee, the expert

5    witness, the court and jury.

6    75.    When Dr. Thong started working for Group Health in St. Joseph Hospital all

7    nocturnists used Franciscan, not Group Health, nurses, technicians, and other support staff at night.

8    76.    According to Drs. Pujol and Thong, all nocturnists hired by Group Health saw

9    only Group Health patients, contrary to the testimony of Defendant's witnesses elicited by

10    Defendant's counsel in *Elkharwily I*.  Counsel knew their testimony was false because Haftel

11    during deposition stated that they would never take care of anyone but Group Health patients.

12    Haftel Dep. 100:25 and that "they would still only have taken care of Group Health patients, not

13    the non-Group Health patients." Id at .101:2-4.

14    77.    Defendant's counsel concealed by redaction and alteration of documents all

15    references to Drs. Pujol, Hasnain and Thong in all minutes of Defendant's credentialing

16    committees reflecting discussion of privileges for them produced by Defendant during discovery

17    in *Elkharwily I*, provided to Defendant's expert witness and used during Plaintiff's internal

18    appeal process.

19    78.    Despite their knowledge to the contrary, Defendant's counsel falsely stated to the

20    jury regarding the existence and availability of Drs. Pujol, Thong and Hasnain, to wit:   "Group

21    Health … did not have staff to monitor Dr. Elkharwily at night."

22    79.    Defendant's counsel highlighted to the jury the absence of evidence of the

23    availability of Group Health hospitalists to proctor Plaintiff, which was caused by Defendant's

24    concealment of their identities, to wit: " No one told you nighttime proctoring was feasible for

18

1    Group Health . . .  And Dr. Elkharwily told you this morning about steps he would have taken --

2    other steps he would have taken had he known. But there was not one witness who came in

3    here and told you that any of those steps would have led to anything differently, or that they were

4    even feasible, or doable. No one told you that."

5        80.      At trial in *Elkharwily I,* Dr. Cammarano, a witness under the control of Defendant

6    and its counsel, testified, referring to the September 13, 2012, minutes of the MEC:

7            Q. What was your understanding of how many nocturnists Group Health had at
8            that time?
9
10            A. I believe we learned from Dr. deLeon that Group Health's plan was to hire a
11            total of four nocturnists. They had a total of zero at this point, and that Dr.
12            Elkharwily was the first hire, and was still the only hire.
13
14
15        81.      Dr. Cammarano's forgoing testimony was false, because Dr. Cammarano was

16    present at the relevant credentialing committee meetings at which the hiring by Group Health

17    and the privileging of the three nocturnists were reflected, which facts had been concealed from

18    Plaintiff.

19        82.      Defendant's counsel did not correct the false testimony of Dr. Cammarano,

20    despite having knowledge of the truth, which counsel had concealed from Plaintiff.

21        83.      Defendant's counsel did not correct the false impression created by their

22    concealment of the existence of three nocturnists already credentialed and privileged by

23    Defendant before September 13, 2012, who were available to proctor Plaintiff before trial to the

24    court, expert witness, or during trial to the court and jury, expert witness, and even after trial

25    with all post judgment motions,  though they had the full and complete multiple opportunities to

26    do so.

27        84.      Concealment by Defendant's counsel of the foregoing critical evidence of the

28    existence and availability of three Group Health nocturnists - Drs. Pujol, Hasnain and Thong –

1    on and after September 13, 2012, to proctor Plaintiff at night, may well have changed the jury's

2    verdict. Concealment of evidence of pretext such as the board certifications and lack of any

3    experience of physicians who have no disability might very well have changed the jury's verdict

4    also.

5         85.    Defendant's counsel misrepresented the facts in his reference in closing to FHS's

6    receipt of Mayo Clinic Albert Lea Hospital asking for Plaintiff's resignation, where he stated that

7    Defendant did not receive it until July 2013, when in fact Plaintiff had provided the letter to

8    Defendant's counsel in December 2012, which was deemed irrelevant by Defendant's Hearing

9    Panel in February 2013.

10        86.    Defendant's counsel knew his statement about when Plaintiff provided the letter

11   from Mayo Clinic Albert Lea to Defendant was false because Defendant's counsel in trial was

12   also Defendant's counsel at a Hearing Panel stage of Plaintiff's internal appeal of his denial of

13   privileges and was sent a copy of the letter in December 2012, weeks before the hearing panel

14   met.  Counsel's false statement and introducing false evidence at closing to the jury prejudiced

15   the administration of justice and violated counsel's duty of candor to the tribunal and fairness to

16   the opponent.

17        87.    Defendant's counsel misrepresented the facts in connection with Defendant's

18   proctoring plan dated August 22, 2017, by stating to the jury that it was Group Health's proposal

19   and that it called for no proctoring, when in fact it was Defendant's plan and called for severe

20   proctoring of Plaintiff.

21        88.    Defendant's counsel knew that his statement to the jury about Defendant's August

22   22, 2012, proctoring plan was false because he was attorney for Defendant at the Hearing Panel,

23   he knew that the August 22, 2012, presented as an exhibit to the Hearing Panel was the plan

24   developed by Defendant, knew that  Defendant's officers identified under oath in the Panel

1    Hearing that the plan the MEC considered was the August 22, 2012, plan proposed by

2    Defendant,  and was the only plan before the MEC when it denied privileges to Plaintiff.

3    Counsel also knew that Defendant never previously claimed that any plan other than Defendant's

4    August 22, 2012, was the proctoring plan was proffered to the MEC.

5        89.    In statements to the jury in *Elkharwily I*, Defendant's counsel misrepresented the

6    nature of the August 22, 2012, plan, in addition to falsely ascribing it to Group Health, to wit:

7        a.    ". . . [MEC] determined that the proctoring plan proposed by Group
8            Health was not sufficient to address its concerns."

9
10       b.    "As for the second conclusion regarding the proctoring plan, first, the
11           MEC didn't think it was sufficient, because it put Dr. Elkharwily back in a
12           Franciscan Health System hospital without having any supervision or monitoring
13           by his employer, Group Health, prior to seeing any patients at St. Joe's. Second,
14           the plan didn't provide for direct supervision for each patient to be seen by Dr.
15           Elkharwily.  Third, if there was going to be a plan to put Dr. Elkharwily in an
16           FHS hospital, seeing patients without first undergoing some sort of monitoring by
17           Group Health, then the MEC felt that that should be at night. Dr. Cammarano will
18           tell you that the MEC felt that. "

19
20       90.    Defendant's counsel's statement that the August 22, 2012, plan did not call for

21    proctoring was knowingly false because counsel knew that Defendant's witness deLeon

22    described the plan as calling for proctoring.

23       91.    Defendant's counsel stated in opening in *Elkharwily I* that "evidence will show

24    that Dr. Elkharwily has not participated or engaged in research in the medical field. He hasn't

25    taken what are called continuing medical education courses that are designed specifically for

26    physicians who have been out of practice for a long period of time, and designed to help them

27    get their knowledge base back up and sharpen their skills."

28       92.    Not only was there no evidence at trial supporting the statement in ¶ 72,

29    Franciscan witness deLeon testified to the opposite and confirmed that Plaintiff had taken the

30    continuing medical education courses because he had active licenses in both Minnesota and

1    Washington, which information was known to Defendant's counsel Mr. Megard during trial and

2    earlier during Plaintiff's application and appeal process.

3        93.    As shown above, Defendant's counsel knowingly and with reckless disregard of

4    the truth, engaged in an unconscionable plan to defraud the court through acts of concealment,

5    fabricating or altering evidence Plaintiff requested and was entitled to, employing and presenting

6    false testimony, under oath, misrepresentations of facts, and compounding on such falsehoods in

7    a pattern of a scheme in order to prevail at all stages of Plaintiff's effort to receive privileges,

8    including his prosecution of his claims in *Elkharwily I*.  Defendant's counsel's acts included

9    concealment of the availability and qualifications of three proctors for Plaintiff in the night

10    setting in Defendant's own hospital, who had previously been credentialed and privileged by

11    Defendant and its credentialing committees to work in St. Joseph's Hospital, and concealed the

12    evidence that Defendant's use of Plaintiff's lack of board certification and experience as pretext.

13    These acts included eliciting false testimony by their hired expert witness and defendants' own

14    witnesses, under oath, in addition to fabricating and altering evidence such as the minutes of

15    credentialing committees. These acts also included misrepresenting that Group Health, not

16    Defendant, proposed the proctoring plan presented to the MEC on September 13, 2012,

17    misrepresenting when Plaintiff provided Dr. Gryzbowski's letter from Mayo Clinic Albert Lea,

18    misrepresenting the essential functions of the job of nocturnist, which prejudiced the

19    administration of justice and showed a lack of candor to the tribunal. Moreover, Defendant's

20    counsel, Mr. Megard and Ms. Seeberger, did not retract, correct or withdrawn any of said

21    instances of concealment, misrepresentation, and falsehoods.

22        94.    Defendant's counsel committed the foregoing acts of concealment,

23    misrepresentation and falsehood in order to deceive and defraud the court and jury.

1    95.    Plaintiff has expended and incurred attorney fees and costs in *Elkharwily I* and

2    Plaintiff has incurred and will incur attorney fees and costs in this action.

3    **THE COURT SHOULD VACATE THE JUDGMENT IN**
4    **CASE NO. 3:15-cv-05579-RJB**
5
6    96.    This court has the inherent power to prevent fraud on the court, including that

7    perpetrated through actions such as those described above, involving failing to make full

8    disclosure of the facts, concealing facts and evidence Plaintiff was entitled to and requested,

9    mischaracterizing the evidence, fabricating or altering evidence, employing and presenting false

10    testimony, under oath, misrepresentations of facts, and compounding such falsehoods and by

11    failing to correct false impressions, which harm the integrity of the court's process, and affect the

12    ability of the court and jury to impartially judge a case.

13    97.    This court has the power to vacate the judgment in *Elkharwily I* and purge the

14    court's records of falsehoods and said judgment because of Defendant's counsel's fraud on the

15    court as alleged herein, and grant a new trial to Plaintiff.

16    **CONCLUSION**

17    Wherefore, Plaintiff demands a judgment and order vacating the judgment of this court in

18    Case No. No. 3:15-cv-05579-RJB, and reopening that case for further proceedings, including a

19    new trial, and awarding Plaintiff his attorneys fees and costs in Case No. No. 3:15-cv-05579-RJB

20    and in this case.

21    Dated: October 17, 2017.
22
23    **ATTORNEYS FOR PLAINTIFF**
24                                */S John C. Cain*
25    Richard T. Wylie (MN ID #11912X)      John C. Cain Bar No. 16164
26    222 South Ninth Street, Suite 1600      802 North Second Street
27    Minneapolis, MN 55402                 Tacoma, WA 98403
28    612-337-9581                           Tel. 253-564-1879
29    Email: rickwlaw@aol.com             Email: cainjd11@comcast.net
30    PRO HAC VICE PENDING