1
2
3
4
5                                                          The Honorable Ronald Leighton
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30                          **UNITED STATES DISTRICT COURT**
31                        **WESTERN DISTRICT OF WASHINGTON**
32
33   ALAA ELKHARWILY, M.D.,

34                                  Plaintiff,              **NO. C17-5838-RBL**
35
36   vs.                                                    **AMENDED COMPLAINT**
37
38   FRANCISCAN HEALTH SYSTEM, a
39   Washington non-profit corporation,

40                                  Defendant.
41
42           Plaintiff, for his complaint herein, states as follows:
43
44
45
46

## INTRODUCTION

1.      Plaintiff brings this action seeking vacation of the judgment, including summary judgment, of this Court entered October 20, 2016, in Case No. 3:15-cv-05579-RJB (hereinafter "Elkharwily I"), because Defendant's counsel, as officers of this court, in said action committed fraud on the court as described herein and procured judgment through an unconscionable scheme to deceive the court and Plaintiff through the use of misleading, inaccurate, false and incomplete responses to discovery requests, failing to produce and concealing documents and information requested and Plaintiff was entitled to in discovery,  fabricating and altering evidence, the presentation of fraudulent evidence, and the failure to correct the false impression created by said, misleading, inaccurate, and incomplete responses and false evidence.

2.      Plaintiff's independent action herein is permitted by Federal Rules of Civil Procedure, Rule 60(d) (3).

## JURISDICTION AND VENUE

3.      This Court has jurisdiction of this action because it seeks relief from the judgment in Case No. 3:15-cv-05579-RJB in this Court because of fraud on the court and the acts complained of herein occurred in the Western District of Washington.

## DEFENDANT'S COUNSEL'S DUTIES RE: FRAUD ON THE COURT

4.      "Where the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practiced on him by his opponent . . . these and similar cases which show that there has never been a real contest in the trial or hearing of the case are reasons . . . to set aside or annul the former judgment or decree, and open the case for a new and fair hearing." *U. S. v. Throckmorton*, 98 U.S. 61, 65, 25 L.Ed. 93 (1878).

5.      Perjury and nondisclosure that defiled a court amounts to a fraud on the court. *In re Levander*, 180 F.3d 1114 (9th Cir. 1999) (quoting 7 James Wm. Moore et al., Moore's Federal Practice ¶ 60.33, at 515 (2d ed. 1978).

6.      A party can be found to have engaged in a scheme to defraud the court and "improperly influence" its decisions through "the use of misleading, inaccurate, and incomplete responses to discovery requests, the presentation of fraudulent evidence, and the failure to correct the false impression created by" a witness' testimony.  *Pumphrey v. K. W. Thompson Tool Co.*, 62 F.3d 1128, 1132 (9th Cir. 1995).

7.      Counsel may not withhold information from his client's discovery responses.  *Id.*

8.      As an officer of the court, counsel has a duty to not mislead the court or fail to correct a misrepresentation or fail to retract false evidence submitted to the court.  *Id.*

9.      The courts have "historic power of equity to set aside [a] fraudulently begotten judgment" in order to uphold the "preservation of the integrity of the judicial process." *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245 (1944).; see also *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) ("[This] inherent power ... allows a federal court to vacate its own judgment upon proof that a fraud has been perpetrated upon the court. [...] Moreover, a court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud."). As the Supreme Court commanded in *Hazel-Atlas*, "the public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud."

10.      "[S]imple dishonesty of any attorney is so damaging on courts and litigants that it is considered fraud upon the court." *Estate of Adams v. Fallini*, No. CV 24539 (Nev. 5th Dist. Ct. Aug. 6, 2014), at 6-7.

11.     "Our adversary system for the resolution of disputes rests on the unshakable foundations that truth is the object of the system's process which is designed for the purpose of dispensing justice … Even the slightest accommodation of deceit or a lack of candor in any material respect quickly erodes the validity of the process." *United States v. Shaffer Equipment Co.*, 11 F3d. 450, 457 (4th Cir. 1993).

12.     Perjury or nondisclosure of evidence alone constitutes fraud on the court if it was so fundamental that it undermined the workings of the adversary process itself. *United States v. Estate of Stonehill,* 660 F.3d 415, 445 (9th Cir. 2011).

13.     "Litigation is not a game. It is the time-honored method of seeking the truth, finding the truth, and doing justice. When a corporation and its counsel refuse to produce directly relevant information an opposing party is entitled to receive, they have abandoned these basic principles in favor of their own interests." *Haeger v. Goodyear Tire & Rubber Co*., 793 F.3d 1122, 1125 n. 1 (9th Cir. 2015) (quoting with favor the trial court.)

14.     Counsel must "certify and sign" and make complete and correct discovery responses and disclosures.  FRCP Rule 26(g).

15.     The Washington Rules of Professional Conduct provide that a lawyer shall not knowingly "1)  make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer" or "(4)  offer evidence that the lawyer knows to be false."  RPC 3.3 (a).

16.     The Washington Rules of Professional Conduct Rule 8.4 (c) provides that a lawyer shall not "engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

17.     The Washington Rules of Professional Conduct Rule 8.4(d) provides that a lawyer shall not "engage in conduct that is prejudicial to the administration of justice."

1    18.    The Washington Rules of Professional Conduct Rule 4.1 provides that in the

2    course of representing client a lawyer shall not knowingly (a) make a false statement of material

3    fact or law to a third person; or (b) fail to disclose a material fact to a third person when

4    disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless

5    disclosure is prohibited by Rule 1.6.

6    19.    To become admitted to practice in this court, counsel swore and promised, *inter*

7    *alia,* "I will conduct myself in an honest and ethical manner at all times. . ."

8    20.    The Washington Rules of Professional Conduct Rules 5.7 and 5.10, provide that

9    all of Defendant's counsel are responsible for correcting the actions of their co-counsel.

10                              **FACTUAL BACKGROUND**

11    21.    *Elkharwily I* was an action in this Court by Plaintiff against Defendant alleging,

12    inter alia, that Defendant violated the Washington Law Against Discrimination by discriminating

13    against Plaintiff because of his disability when it denied Plaintiff's application for privileges to

14    practice medicine in one of Defendant's hospitals so that Plaintiff could work as a nighttime

15    hospitalist for Group Health System in that hospital.

16    22.    Defendant, a corporation, was represented in *Elkharwily I* by the firm of Brown,

17    Bennett & Bigelow and attorneys Bruce Megard and Erin Seeberger of said firm.

18    23.    Defendant and its administrators, and various committees including but not

19    limited to the Medical Executive Committee (MEC), the RCC, and the Credentialing and

20    privileges signing members, were all represented by said Counsel since the beginning of

21    Plaintiff's application for privileges through the internal appeal process before various tribunals,

22    bodies and committees.

23    24.    *Elkharwily I* was tried to a jury and on October 19, 2016, the jury returned a

24    verdict in favor of Defendant.

25.    In *Elkharwily I,* Group Health had offered Plaintiff a job as a nighttime hospitalist at its St. Joseph's Hospital in Tacoma, WA, contingent upon Defendant granting privileges to Plaintiff.

26.    A crucial issue in *Elkharwily I* was whether Defendant refused to give Plaintiff a chance to prove his competency through proctoring by Group Health System hospitalists at night at Defendant's hospital on and after September 13, 2012.

27.    Defendant claimed in *Elkharwily I* that the unavailability of Group Health hospitalists to proctor Plaintiff at night was the most important reason for Defendant denying privileges to Plaintiff, and Defendant's counsel so argued to the jury.

28.    Defendant's voluntary summary judgment motion in *Elkharwily I*, signed by Defendant's counsel, stated as true fact that Group Health could not provide proctoring for Plaintiff because Group Health <u>did not have available hospitalists(s) to proctor Plaintiff at night</u>. For example, in Defendant's summary judgment motion in *Elkharwily I*, at 23, Defendant stated, ". . . it would have been absolutely reasonable for FHS to determine that night shift proctoring was necessary, and to deny his application <u>where such proctoring was not available."</u>

29.    In fact, Group Health had hospitalists available and qualified to proctor Plaintiff at relevant times, at its St. Joseph's Hospital in Tacoma, WA on and after September 13, 2012, to wit: Dr. Bob Thong, Dr. Saif Hasnain, and Dr. Lisa Pujol, who had previously been credentialed and privileged by Defendant and its credentialing committees in August 2012 to work in St. Joseph's Hospital.   At relevant times, these three doctors were privileged by Defendant, depended on those privileges for their employment, and were thus under the influence of Defendant's counsel.

30.    Plaintiff contacted Dr. Thong on or about May 5 or 6, 2017.  Plaintiff was thereafter informed by Defendant's offices that Dr. Thong had left Defendant's hospital suddenly

1    in June 2012.  But on or about July 18, 2017, Plaintiff reached Dr. Thong and he confirmed for

2    Plaintiff that the facts attributed to him herein were true and correct.

3        31.    According to Dr. Thong, he had been licensed to practice medicine in Washington

4    since 2009 and worked for Group Health from September 2012 to at least June, 2017, as a

5    nocturnist, including at Defendant's St. Joseph's Hospital from 2012 - 2014.  Dr. Thong was an

6    employee of Group Health at Defendant's hospitals throughout the pendency of *Elkharwily I* and

7    was previously credentialed and privileged by Defendant and its credentialing committees to

8    work in St. Joseph's Hospital.

9        32.    According to Dr. Thong, Dr. Thong possessed the experience and tenure to

10    proctor Plaintiff as a nocturnist.  He had worked for Defendant for about 4 years prior to

11    September 2012 as a nocturnist in Defendant's St Joseph Hospital, where Plaintiff had been

12    hired to work by Group Health.  Dr. Thong had covered and managed Group Health patients at

13    night for those four years before joining Group Health's team. He had proctored medical

14    personnel/before joining Group Health in 2012.  Dr. Thong had experience proctoring doctors

15    one-on-one, including four to five residents per month including while he was working for

16    Group Health.

17        33.    Dr. Thong, according to him, was available and would have been willing to

18    proctor Plaintiff as a nocturnist from September 13, 2012, onward.

19        34.    Dr. Hasnain passed his internal medicine boards in August 2012. He was

20    therefore qualified to proctor Plaintiff at relevant times. Dr. Hasnain remained an employee of

21    Group Health working at Defendant's hospitals throughout the pendency of *Elkharwily I*. Dr.

22    Hasnain has been advanced in leadership positions through his tenure.

23        35.    Dr. Hasnain was available to proctor Plaintiff from September 13, 2012, onward,

24    according to Dr. Thong.  Dr. Hasnain worked as a nocturnist in September 2012 for Group Health in

7

1    Defendant's St Joseph Hospital for two years before moving to and continuing working for Group

2    Health in another of Defendant's hospitals.

3    36.    Dr. Hasnain was granted credentials and privileges by Defendant and its credentialing

4    committees in August 2012, before he had any clinical experience following residency.

5    37.    By 2012, Dr. Pujol had several years' experience as a nocturnist and had passed

6    her internal medicine boards in 2005.   Dr. Pujol was therefore qualified to proctor Plaintiff at

7    relevant times.  She was previously credentialed and privileged by Defendant and its

8    credentialing committees to work in St. Joseph's Hospital.

9    38.    Dr. Pujol was available to proctor Plaintiff in and after September 2012,

10    according to Dr. Thong.

11    39.    In June and July 2017, administrators in the medical affairs and credentialing

12    departments for Defendant's St. Joseph's Hospital stated that Drs. Pujol, Hasnain and Thong

13    were approved for privileges by Defendant's Vice President of Medical Affairs, Dr. Dennis

14    Deleon, and the section chief at St. Josephs, Dr. David Dempster, and were approved and granted

15    privileges at St. Joseph's in August 2012.

16    40.    In July 2017, Defendant's counsel prohibited Plaintiff from contacting

17    administrators and employees, so that Plaintiff could not obtain information about the privileges,

18    qualifications and availability of Drs. Pujol, Hasnain and Thong to proctor Plaintiff.

19    41.    After being told by Defendant's staffing and credentialing personnel and Dr.

20    Thong, that Drs. Pujol, Hasnain and Thong were privileged in August 2017, and available to

21    proctor Plaintiff, Plaintiff reviewed the minutes provided by Defendant's counsel during his

22    internal appeal process and in *Elkharwily I,* and discovered that Defendant's counsel had

23    fabricated and altered those committee minutes so as to conceal evidence of the availability, and

1   qualifications of those three doctors to proctor him and the fact that they were granted privileges

2   by defendant in August 2012.

3        42.    It was undisputed in *Elkharwily I* that Defendant never told Plaintiff that night

4   time proctorship was required. Nor did Defendant tell Group Health that proctorship at night was

5   required for Plaintiff's privileges.  At relevant times, Plaintiff knew that Group Health intended

6   to hire noturnists in addition to himself, but Plaintiff did not know whether they were actually

7   hired or were granted privileges by Defendant, which process was distinct and independent from

8   Group Health's credentialing process.   This was confirmed by Defendant's Counsel, who stated

9   to the jury and to the court  in his opening statement at *Elkharwily I* Transcript., 10/11/2016, at

10  28, "..So even though Dr. Elkharwily had been hired by Group Health, FHS had this independent

11  responsibility to engage in this credentialing process in order to comply with its bylaws, in order

12  to properly vet Dr. Elkharwily, to carefully and critically examine his application, and to try and

13  ensure that only competent physicians could provide care to its patients in the hospital safely.

14  The credentialing process is required by the Joint Commission on accreditation of hospitals. It is

15  also required by Medicare, who requires that hospitals do that if they see patients who are

16  covered by Medicare." And counsel reconfirmed the same at closing at *Elkharwily I* Transcript,

17  10/182016, at 93,  " But you have heard that whatever happens at Group Health is independent

18  of Franciscan's obligations for credentialing, as required under the Joint Commission guidelines

19  and by Medicare"

20        43.    During Defendant's internal appeal of Defendant's denial of Plaintiff's

21  application for privileges to Defendant's Review Panel, Appellate Review Board and Board in

22  2013, counsel for Defendant, Mr. Megard, concealed from Plaintiff and from Defendant's

23  Review Panel and Appellate Review Board and Board, whose meetings he attended as attorney

24  for the MEC, the foregoing information about the availability and qualifications of the three

1    Group Health nocturnists to proctor Plaintiff, and failed to correct testimony to the contrary

2    provided to said bodies.

3          44.     The minutes of Defendant's Regional Credentialing Committee on August 6,

4    2012, and Medical Executive Committee on August 9, 2012, and September 13, 2012, provided

5    to the Hearing Panel which met in January 2013, were fabricated, and altered by Defendant's

6    counsel so as to exclude one or more sections of information showing the availability of the three

7    Group Health Nocturnists to proctor Plaintiff.

8          45.      In connection with the hearing panel in January 2013, Defendant's counsel

9    represented to Plaintiff, to the chairperson and to the panel that he had produced all documents.

10   As this court noted "Mr. Bruce Megard, Defendant's lawyer, states in a signed

11   declaration............that if Mr. Megard had been asked, he "would have informed [Plaintiff] that

12   <u>all discovery documents under FHS's Medical Staff Bylaws had already been produced during</u>

13   <u>the course of the appeal process</u> and that additional disclosures were not permitted under those

14   same Bylaws. Dkt. 66 at ¶¶2, 3." Counsel, however, produced fabricated, altered and false

15   minutes and thereby concealed the evidence of the availability and qualifications of Group

16   Health proctors who had been previously credentialed by Defendant in August 2012 and were

17   available to proctor Plaintiff at night.

18         46.     Throughout the Panel Review hearing Defendant's counsel and Defendant's

19   administrators, Drs. deLeon and Cammarano, proceeded without correcting the record that was

20   used to support Defendant's position that Group Health proctors were not available for Plaintiff,

21   although Defendant's counsel, Cammarano and deLeon knew there were proctors available.

22         47.     In his opening letter to Defendant's Hearing Panel, and before hearing any

23   testimony from any one, including David Dempster M.D., a Group Health physician and also a

24   clinical section chief and administrator of Defendant FHS, Mr. Megard stated: "The MEC

1    recognized at the meeting that Dr. Elkharwily was hired as a nocturnist but the proctoring plan

2    did not cover monitoring or observation during what would be Dr. Elkharwily's normal shift. The

3    MEC did not believe that this proctoring plan was sufficient because it felt that the proctoring

4    should take place in the same environment in which the practitioner would practice. . . Here, the

5    concerns about Dr. Elkharwily's <u>lack of board certification</u>, his limited clinical activity during the

6    previous two years, <u>his lack of experience in a hospital setting</u>, <u>and the unavailability of any</u>

7    <u>appropriate proctoring or supervision during the night shift in the hospital clearly establishes that</u>

8    <u>a reasonable mind could accept that the evidence supports the recommendation to deny his</u>

9    <u>appointment</u>."  Megard letter, 12/31/2012, at 5-8.

10    48.    Although Defendant's counsel Mr. Megard knew by the time of the Hearing Panel

11    hearing in January 2013 that there had been three Group Health nocturnists privileged by

12    Defendant available and qualified to proctor Plaintiff at night, whose existence counsel

13    concealed from the hearing panel and Plaintiff, he compounded the concealment of evidence and

14    the production of fabricated, altered and falsified minutes to the Panel Hearing by stating to the

15    panel that Dr. Elkharwily was:

16    "responsible for supporting his ...challenge to the adverse recommendation or decision by
17    presenting relevant evidence as rebuttal."(Bylaws, ArticleVII.7.E.) Dr. Elkharwily
18    ultimately has the burden of proof at this Hearing to show that the decision was
19    unreasonable or not supported by the evidence. In other words, he must show the MEC's
20    decision was arbitrary and capricious.
21
22    Megard letter to Panel Hearing, 1/31/2013, at pages 3-4.

23

24
25    49.    During the panel hearing, Dr. Dempster, a Group Health physician and also

26    clinical section chief and administrator for Defendant, testified that Group Health had no

27    "redundant" staffing to proctor Plaintiff, which was contrary to the facts and records concealed

28    from Plaintiff

1    50.    Had the Hearing Panel known of the fabricated evidence provided by Defendant's

2    counsel and concealment of the evidence of availability, qualifications and even the existence of

3    the three Group Health nocturnists to proctor Plaintiff in August 2012, it would have found that

4    the MEC had acted in bad faith.

5    51.    To Defendant's Appellate Review Board, Mr. Megard wrote on May 7, 2013,

6    page 5, "Therefore, additional discussions about the proctoring plan with Group Health would

7    not address the MEC's concerns, as there was no proctoring available at night. The MEC's

8    recommendation was reasonable and should be upheld."

9    52.    Had the Appellate Review Board known of the availability and qualifications of

10    the three Group Health nocturnists, it would have reversed Defendant's denial of privileges to

11    Plaintiff.

12    53.    In its report to the National Practitioners Data Bank, Defendant stated that

13    Plaintiff had failed to demonstrate the scope and adequacy of his experience or his current

14    clinical skill and competence for active medical staff membership and privileges.  This statement

15    was in furtherance of Defendant's and its counsel's course of fraudulently denying Plaintiff his

16    rights by not telling Plaintiff that he needed night proctoring to show his qualifications knowing

17    that Group Health had nocturnists available and qualified  to proctor him and had been granted

18    privileges already by Defendant in August 2012

19    54.    The court in Elkharwily I granted summary judgment on Plaintiff's defamation

20    claim based on Defendant's aforesaid report to the National Practitioners Data Bank on the

21    grounds that the report was privileged.

22    55.    Had Defendant's counsel not presented fabricated and altered evidence and

23    concealed the evidence in their possession of the identity and qualifications of the three available

24    Group Health nocturnists to proctor Plaintiff, which nocturnists had been previously credentialed

1    and privileged by Defendant in August 2012, Plaintiff could have successfully shown that

2    Defendant acted in bad faith and knowingly prohibited Plaintiff from even the chance of showing

3    his qualifications.

4        56.    At trial Defendant's counsel argued that Defendant's MEC had acted in good

5    faith, compounding counsel's fraudulent concealment of evidence of the availability and

6    qualifications of the three available nocturnists to proctor Plaintiff.

7        57.    Plaintiff's Request for Production No. 6 demanded that Defendant "Produce all

8    agendas, minutes, recordings, transcripts, exhibits, evidence, notes, correspondence and other

9    documents related to each meeting, hearing, appeal and other proceeding related to Plaintiff's

10    application for privileges and Defendant's action thereon."

11        58.    In response to Plaintiff's Request for Production of Documents No. 6 in

12    *Elkharwily I,* Defendant through its counsel produced versions of minutes of Defendant's

13    Regional Credential Committee on August 6, 2012, and Defendant's Medical Executive

14    Committee on August 9 and September 13, 2012, which were altered by Defendant's counsel to

15    conceal portions of said minutes that reflected the availability of said Group Health nocturnists to

16    proctor Plaintiff. Additionally, Defendant's counsel produced, advanced and used, knowingly

17    and with reckless disregard of the truth, the altered and falsified minutes as evidence in court of

18    law to advance their scheme of defrauding Plaintiff, the jury, and the court.

19        59.    Defendant's counsel concealed evidence in response to then pro se Plaintiff's

20    Interrogatory No. 3 to Defendant in *Elkharwily I,* which asked Defendant to "Identify each

21    physician who performed hospitalist services in Defendant's hospital as an employee or contract

22    physician in 2011-2013." On March 7, 2016, in response to Interrogatory No. 3, signed by

23    Defendant's counsel, Defendant's counsel produced a list of hospitalists from Defendant's FIT

24    Inpatient Team.  Drs. Pujol and Hasnain were not on that list.  Dr. Thong was on the list as a FHS

1   employee.  However, that reference does not suggest that he was also a GHP hospitalist during that

2   time period.  If Defendant had included and identified him as "contract" physician, Plaintiff could

3   have determined Dr. Thong's relationship to GHP. And, if Defendant had included Dr. Pujol or Dr.

4   Hasnain on the contract physician list Plaintiff could have determined their availability as Group

5   Health nocturnists working in Defendant's hospital to proctor Defendant

6        60.    Defendant's counsel concealed evidence in response to then pro se Plaintiff's

7   Interrogatory 7 in *Elkharwily I,* which asked: "Identify by name, race and national origin of [sic]

8   each physician who applied for privileges to practice in Defendant's hospital in 2011-2013."  On

9   March 7, 2016, in response to Interrogatory No 7, Defendant's counsel produced a 47 page list

10  "reflecting all physicians who have been granted privileges by Defendant from 2009 to 2015…"

11  Said three physicians' names were not on that list.

12       61.    Defendant's counsel concealed evidence in response to Plaintiff's Third Set of

13  Interrogatories, No. 1, which asked for the identity of physicians who had applied for privileges

14  to Defendant from 2010-2015  who were granted privileges without any clinical experience

15  following residency.   On June 27, 2016, three days before the discovery deadline, Defendant's

16  counsel produced a 22-page list of "medical staff members who were granted privileges"

17  between 2010 and 2015, which was marked by Defendant's counsel as Bates Nos. FHS 001025-

18  001046**.** Physicians on this list were identified only by number**.**  Dr. Hasnain's name was not

19  disclosed on that list, although he was granted privileges without having any clinical experience

20  after residency.

21       62.    Defendant's counsel concealed evidence in response to Plaintiff's Third Set of

22  Interrogatories, No. 2, which asked for information about physicians granted privileges who

23  were not board certified when privileges were granted.  On June 27, 2016, three days before the

24  discovery deadline, Defendant's counsel produced a list of doctors, identified by number only,

1    who were not board certified when granted privileges by FHS and a list of those who became

2    board certified after privileging, which was marked by Defendant's counsel as Bates Nos. FHS

3    001047-FHS001050.  Physicians on this list were identified only by number and Dr. Thong's

4    name was not on that list.    Counsel argued in opposition to Plaintiff's motion to compel and

5    misrepresented to the court that the names of proctors are irrelevant. Counsel knew very well the

6    relevance of those names, identities and their qualification both in prosecuting Plaintiff's case

7    and in showing the fatality of Defendant's defense. The court was persuaded by counsel's deceit

8    and misrepresentation to deny Plaintiff's motion to compel.

9        63.    Defendant's counsel's concealment of the matter of Dr. Hasnain's lack of

10   experience and Dr. Thong's lack of board certification when they were granted privileges

11   deprived the court and jury of information important to considering whether Defendant's reasons

12   for denying privileges to Plaintiff were pretext.

13       64.    Defendant's counsel, Mr. Megard and Ms. Seeberger, hired an expert witness for

14   Defendant, Dr. Nancy Auer, and solicited and elicited her report and testimony before the court

15   and jury in *Elkharwily I.*

16       65.    Defendant's counsel identified Dr. Auer as an expert by disclosure, signed and

17   dated April 28, 2016, and reserved the right to amend or supplement its disclosure, which they

18   never did.

19       66.    Defendant's counsel's hiring an expert and supplying her with documents to

20   review on which to base her opinion was voluntary.  Defendant's counsel's choice of documents

21   to provide to Dr. Auer for review was voluntary and intentional.

22       67.    Defendant's counsel provided Dr. Auer with documents to review before

23   rendering her opinion in *Elkharwily I,* including the fabricated and altered and falsified minutes

1   of the MEC and RCC to use as evidence to advance her testimony, under oath, in court to further

2   their scheme to defraud Plaintiff, the jury, and the court.

3        68.    On March 28, 2016, Dr. Auer issued her expert report. Her report stated that she

4   had reviewed and considered the following documents in reaching her opinions in *Elkharwily I*:

5             **a.**  "Plaintiff's Second Amended Complaint;

6             **b.**  Defendant Franciscan Health System's Initial Disclosures with exhibits and

7                   attachments thereto;

8             **c.**  Defendant Franciscan Health System's Supplemental Initial Disclosures with

9                   exhibits and attachments thereto;

10            **d.**  Defendant Franciscan Health System's Second Supplemental Initial Disclosures

11                  with exhibits and attachments thereto;

12            **e.**  Plaintiff s Interrogatories and Requests for Production to Defendant with Answers

13                  and Responses Thereto dated March 7, 2016, with exhibits and attachments

14                  thereto."

15  In addition to the foregoing listed materials, Dr. Auer stated that she intended "to review any

16  depositions which may occur in (*Elkharwily I*), any supplemental documents produced by the

17  parties, and other expert reports produced by the parties in this matter."

18       69.    At trial, Dr. Auer testified that in developing her opinions she reviewed, "A whole

19  bunch of paper. . . Dr. Elkharwily's application, his due process committee meetings, all of the

20  paperwork he presented in this case, and the depositions taken in this case." She also reviewed

21  'the Franciscan Health System Bylaws" and "all of the minutes from the various committee

22  meetings that discussed Dr. Elkharwily and all of the testimony and documents associated with

23  [Plaintiff's] process."

1      70.     Dr. Auer read, reviewed and relied on all documents given to her by Defendant's

2    counsel, including those that were fabricated and altered to conceal evidence and facts

3    concerning the three nocturnists available to proctor Plaintiff and including the committees'

4    minutes that were fabricated, altered and falsified.

5      71.     Defendant's counsel fraudulently, knowingly and willfully also concealed from

6    Dr. Auer the evidence of the availability and qualifications of Group Health nocturnists who

7    have been granted privileges already by Defendant in August 2011. Drs. Thong, Hasnain and

8    Pujol, to proctor Plaintiff at night.  Thus, Dr. Auer was left with the understanding that there

9    were no Group Health nocturnists available to proctor Plaintiff at night at Defendant hospital at

10    the time Defendants claimed night proctorship was essential and fundamental issue to grant

11    Plaintiff privileges.

12      72.     Defendant's counsel also concealed from Dr. Auer facts, documents and

13    information about Drs. Hasnain and Thong regarding their board certification and experience

14    stated above. Counsel willfully and knowingly advanced her testimony, under oath, as an expert

15    to the court and jury and at no time did they attempt to correct, withdraw or supplement her

16    testimony.

17      73.     Because of Defendant's counsel's fraudulent concealment of the facts regarding

18    Drs. Thong, Hasnain and Pujol, and because of their presentation of fabricated and altered, and

19    falsified documents such as the minutes of MEC and RCC to her, Dr. Auer issued a misleading

20    and false expert report in *Elkharwily I*, which stated at page 4, "Because proctoring was not

21    available by Group Health in the clinical setting in which Dr. Elkharwily intended to practice, it

22    was reasonable for FHS to deny his application for medical staff membership." And at page 5 of

23    her report, Dr. Auer stated, "Because nocturnal monitoring was not available by Group Health, it

24    was reasonable for FHS to deny Dr. Elkharwily's application for medical staff membership.

1    74.    At trial in *Elkharwily I,* Defendant's counsel willfully advanced false evidence,

2    under oath, to the jury and court and failed to correct same, by asking Dr. Auer, "If proctoring

3    was not available for Dr. Elkharwily in the night-shift, in your opinion, did denial of his

4    application meet credentialing standards?" to which the witness answered  "Yes."

5    75    Had Dr. Auer known of the availability and qualifications of the three Group

6    Health nocturnists to proctor Plaintiff, concealed by Defendant's counsel, she would have

7    testified that Defendant did not meet credentialing standards in denying privileges to Plaintiff,

8    when Defendant knew and possessed the evidence of the availability and qualification of the

9    three Group Health nocturnists working in their own very hospital. 76.    Defendant's counsel

10    knew and had in their possession the facts and the evidence that Drs. Thong, Hasnain and Pujol

11    were Group Health hospitalists available and qualified to proctor Plaintiff on and after

12    September 13, 2012, at Defendant's hospital, and that they  had been granted privileges by

13    Defendant in August 2012.

14    77.    Drs. Thong, Hasnain and Pujol were granted privileges by Defendant to work in

15    St. Joseph's Hospital August 2012, and Defendant's witnesses in *Elkharwily I*, Drs. Cammarano,

16    deLeon and Haftel, as members of Defendant's credentialing committees, knew of them, as did

17    Dr. Dempster as clinical section chief and administrator of Defendant.

18    78.    Because Drs.Thong, Hasnain and Pujol were granted privileges by Defendant,

19    they were referred to in Defendant's credentialing committees' minutes for relevant times as

20    Group Health hospitalists, but their names and affiliations with Group Health were concealed by

21    Defendant's counsel from Plaintiff, the  hearing panel, the Panel Review committee, the expert

22    witness, the court and jury.

1      79.     According to Dr. Thong, when he started working for Group Health in St. Joseph

2   Hospital all nocturnists used Franciscan, not Group Health, nurses, technicians, and other support

3   staff at night.

4      80.     According to Drs. Pujol and Thong, all nocturnists hired by Group Health saw

5   only Group Health patients, contrary to the testimony of Defendant's witnesses elicited by

6   Defendant's counsel in *Elkharwily I*.  Counsel knew their testimony was false because Haftel

7   during deposition stated that they would never take care of anyone but Group Health patients.

8   Haftel Dep. 100:25 and that "they would still only have taken care of Group Health patients, not

9   the non-Group Health patients." Id at .101:2-4.

10      81.     Defendant's counsel concealed by  fabrication, alteration, falsification and

11   redaction of documents all references to Drs. Pujol, Hasnain and Thong in all minutes of

12   Defendant's credentialing committees reflecting discussion of privileges for them produced by

13   Defendant during discovery in *Elkharwily I*, provided to Defendant's expert witness and used

14   during Plaintiff's internal appeal process.

15      82.     Despite their knowledge and possession of evidence to the contrary, Defendant's

16   counsel falsely stated to the jury regarding the existence and availability of Drs. Pujol, Thong

17   and Hasnain, to wit:   "Group Health … did not have staff to monitor Dr. Elkharwily at night."

18      83.     Defendant's counsel highlighted to the jury the absence of evidence of the

19   availability of Group Health hospitalists to proctor Plaintiff, which was caused by Defendant's

20   counsel's concealment of their identities and credentialing by Defendant in August 2012, to wit:

21   " No one told you nighttime proctoring was feasible for Group Health . . .  And Dr. Elkharwily

22   told you this morning about steps he would have taken -- other steps he would have taken had he

23   known. But there was not one witness who came in here and told you that any of those steps

1    would have led to anything differently, or that they were even feasible, or doable. No one told

2    you that."

3        84.    At trial in *Elkharwily I,* Dr. Cammarano, a witness under the control of Defendant

4    and its counsel, testified, referring to the September 13, 2012, minutes of the MEC:

5             Q. What was your understanding of how many nocturnists Group Health had at
6             that time?
7
8              A. I believe we learned from Dr. deLeon that Group Health's plan was to hire a
9             total of four nocturnists. They had a total of zero at this point, and that Dr.
10            Elkharwily was the first hire, and was still the only hire.

11
12
13       85.    Dr. Cammarano's forgoing testimony was false, because Dr. Cammarano was

14   present at the relevant credentialing committee meetings at which the hiring by Group Health

15   and the privileging of the three nocturnists were reflected, which facts had been concealed from

16   Plaintiff.

17       86.    Defendant's counsel did not correct the false testimony of Dr. Cammarano,

18   despite having knowledge of the truth, which counsel had concealed from Plaintiff through

19   fabricating and altering evidence in the form of credentialing committees minutes.

20       87.    Defendant's counsel did not correct the false impression created by their

21   fabrication and falsification of evidence and by concealment of the existence of three nocturnists

22   already credentialed and privileged by Defendant before September 13, 2012, who were

23   available to proctor Plaintiff before trial to the  court, expert witness, or during trial to the court

24   and jury, expert witness, and even after trial with all post judgment motions,  though they had the

25   full and complete multiple opportunities to do so, including, for example, during Plaintiff's Rule

26   60b)  motion in *Elkharwily I*, where  Defendant's counsel stated, "It is undisputed that more

27   tenured and experienced nocturnists is something Group Health did not have."  Doc. 168, p. 8,

28   lines 2-3.  Counsel also wrote, "Plaintiff has provided no competent evidence of any untruth or

1 concealment by FHS representatives or employees.  Lacking such, Plaintiff cannot establish

2 fraud." Doc. 168, p. 7.

3   88. Concealment by Defendant's counsel of the foregoing critical evidence of the

4 existence and availability of three Group Health nocturnists - Drs. Pujol, Hasnain and Thong –

5 on and after September 13, 2012, (their having been credentialed in August 2012) to proctor

6 Plaintiff at night, may well have changed the jury's verdict. Concealment of evidence of pretext

7 such as the board certifications and lack of any experience of physicians who have no disability

8 might very well have changed the jury's verdict also.

9   89. As background evidence of Defendant's counsel's scheme to defraud the court,

10 counsel did not produce emails between counsel and Plaintiff in December 2012 showing when

11 Plaintiff provided Defendant with the letter from Mayo Clinic Albert Lea asking for Plaintiff's

12 resignation, and then misrepresented the facts in counsel's reference in closing to FHS's receipt

13 of said letter, where he stated that Defendant did not receive it until July 2013, when in fact

14 Plaintiff had provided the letter to Defendant's counsel on December 24, 2012, which was

15 deemed irrelevant by Defendant's Hearing Panel in February 2013.

16   90. Defendant's counsel knew his statement about when Plaintiff provided the letter

17 from Mayo Clinic Albert Lea to Defendant was false because Defendant's counsel in trial was

18 also Defendant's counsel at a Hearing Panel stage of Plaintiff's internal appeal of his denial of

19 privileges and was sent by Plaintiff  a copy of the letter in December 2012, weeks before the

20 hearing panel met.  Counsel's false statement and introducing false evidence at closing to the

21 jury prejudiced the administration of justice and violated counsel's duty of candor to the tribunal

22 and fairness to the opponent.

23   91. As background evidence of Defendant's counsel's scheme to defraud the court,

24 counsel misrepresented the facts in connection with Defendant's proctoring plan dated August

1    22, 2017, by stating to the jury that it was Group Health's proposal and that it called for no

2    proctoring, when in fact it was Defendant's plan and called for severe proctoring of Plaintiff.

3        92.    Defendant's counsel knew that his statement to the jury about Defendant's August

4    22, 2012, proctoring plan was false because he was attorney for Defendant at the Hearing Panel,

5    he knew that the August 22, 2012, presented as an exhibit to the Hearing Panel was the plan

6    developed by Defendant, knew that  Defendant's officers identified under oath in the Panel

7    Hearing that the plan the MEC considered was the August 22, 2012, plan proposed by

8    Defendant,  and was the only plan before the MEC when it denied privileges to Plaintiff.

9    Counsel also knew that Defendant never previously claimed that any plan other than Defendant's

10    August 22, 2012, was the proctoring plan was proffered to the MEC.

11        93.    As background evidence of counsel's scheme to defraud the court, in statements

12    to the jury in *Elkharwily I*, Defendant's counsel misrepresented the nature of the August 22,

13    2012, plan, in addition to falsely ascribing it to Group Health, to wit:

14        a.    ". . . [MEC] determined that the proctoring plan proposed by Group
15        Health was not sufficient to address its concerns."

16
17        b.    "As for the second conclusion regarding the proctoring plan, first, the
18        MEC didn't think it was sufficient, because it put Dr. Elkharwily back in a
19        Franciscan Health System hospital <u>without having any supervision or monitoring</u>
20        <u>by his employer, Group Health</u>, prior to seeing any patients at St. Joe's. Second,
21        the <u>plan didn't provide for direct supervision for each patient to be seen by Dr.</u>
22        <u>Elkharwily.</u>  Third, if there was going to be a plan to put Dr. Elkharwily in an
23        FHS hospital, <u>seeing patients without first undergoing some sort of monitoring by</u>
24        <u>Group Health</u>, then the MEC felt that that should be at night. Dr. Cammarano will
25        tell you that the MEC felt that. "

26
27        94.    Defendant's counsel's statement that the August 22, 2012, plan did not call for

28    proctoring was knowingly false because counsel knew that Defendant's witness deLeon

29    described the plan as calling for proctoring.

95.     As background evidence of Defendant's counsel's fraud on the court, counsel

stated in opening in *Elkharwily I* that "evidence will show that Dr. Elkharwily has not

participated or engaged in research in the medical field. He hasn't taken what are called

continuing medical education courses that are designed specifically for physicians who have

been out of practice for a long period of time, and designed to help them get their knowledge

base back up and sharpen their skills."

96.     Not only was there no evidence at trial supporting the statement in the previous

paragraph,   Franciscan witness deLeon testified to the opposite and confirmed that Plaintiff had

taken the continuing medical education courses because he had active licenses in both Minnesota

and Washington, which information was known to Defendant's counsel Mr. Megard during trial

and earlier during Plaintiff's application and appeal process.

97.     As shown above, Defendant's counsel knowingly and with reckless disregard of

the truth, engaged in an unconscionable plan to defraud the court through acts of concealment,

fabrication  and alteration of evidence to conceal from the district court, Defendant's own expert

and from Plaintiff  the existence,  identity, availability and qualifications of three proctors for

Plaintiff at night, who had been credentialed and privileged in August 2012 by Defendant to

work in St. Joseph's Hospital, and to conceal the evidence that Defendant's use of Plaintiff's

lack of board certification and experience was pretext These acts were done against the backdrop

of  counsel presenting fabricated and altered evidence relating to available proctors to

Defendant's hearing panel and MEC in January and February 2013, and presenting false

testimony and  misrepresentations of facts,, . including misrepresenting that Group Health, not

Defendant, proposed the proctoring plan presented to the MEC on September 13, 2012,

misrepresenting when Plaintiff provided Dr. Gryzbowski's letter from Mayo Clinic Albert Lea,

and misrepresenting the essential functions of the job of nocturnist.  All of Defendant's counsel's

1    conduct described herein prejudiced the administration of justice and showed a lack of candor to

2    the tribunal. Moreover, Defendant's counsel, Mr. Megard and Ms. Seeberger, did not retract,

3    correct or withdrawn any of said instances of concealment, misrepresentation, and falsehoods.

4        98.    Defendant's counsel committed the foregoing acts of concealment,

5    misrepresentation and falsehood in order to deceive and defraud the court and jury.

6        99.    Plaintiff has expended and incurred attorney fees and costs in *Elkharwily I* and

7    Plaintiff has incurred and will incur attorney fees and costs in this action.

8                    **THE COURT SHOULD VACATE THE JUDGMENT IN**
9                    **CASE NO. 3:15-cv-05579-RJB**
10
11       100.    This court has the inherent power to prevent fraud on the court, including that

12   perpetrated through actions such as those described above, involving failing to make full

13   disclosure of the facts, concealing facts and evidence Plaintiff was entitled to and requested,

14   mischaracterizing the evidence,  fabricating or altering evidence, employing and presenting false

15   testimony, under oath, misrepresentations of facts, and compounding such falsehoods and by

16   failing to correct false impressions, which harm the integrity of the court's process, and affect the

17   ability of the court and jury to impartially judge a case.

18       101.    This court has the power to vacate the judgment in *Elkharwily I* and purge the

19   court's records of falsehoods and said judgment because of Defendant's counsel's fraud on the

20   court as alleged herein, and grant a new trial to Plaintiff.

21                            **CONCLUSION**

22       Wherefore, Plaintiff demands a judgment and order vacating the judgment of this court in

23   Case No. No. 3:15-cv-05579-RJB, and reopening that case for further proceedings, including a

24   new trial, and awarding Plaintiff his attorneys fees and costs in Case No. No. 3:15-cv-05579-RJB

25   and in this case.

1   Dated: November 12, 2017.

2

3 **ATTORNEYS FOR PLAINTIFF**

4

5 */Richard W. Wylie*_____   *s/john C. Cain*_____

6 Richard T. Wylie (MN ID #11912X)  John C. Cain Bar No. 16164

7 222 South Ninth Street, Suite 1600   802 North Second Street

8 Minneapolis, MN 55402      Tacoma, WA 98403

9 612-337-9581         Tel. 253-564-1879

10 Email: rickwlaw@aol.com     Email: cainjd11@comcast.net

11